**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

NATIONAL AUDUBON SOCIETY           )
225 Varick Street                          )
New York, NY 10014,                     )
                                                    )
AMERICAN BIRD CONSERVANCY    )
4301 Connecticut Avenue, N.W.         )
Washington, D.C. 20008,                   )
                                                    )
CENTER FOR BIOLOGICAL            )
DIVERSITY                                   )
378 N. Main                                   )
Tucson, AZ 85701,                           )
                                                    )
DEFENDERS OF WILDLIFE             )        Civ No.
1130 17th Street, N.W.                       )
Washington, D.C. 20036,                   )
                                                    )
                    Plaintiffs,                 )
                                                    )
              v.                                   )
                                                    )
U.S. DEPARTMENT OF THE INTERIOR  )
1849 C Street, N.W.                          )
Washington, D.C. 20240,                   )
                                                    )
U.S. FISH AND WILDLIFE SERVICE   )
1849 C Street, N.W.                          )
Washington, D.C. 20240,                   )
                                                    )
DANIEL JORJANI                           )
1849 C Street, N.W.                          )
Washington, D.C. 20240,                   )
                                                    )
                    Defendants.               )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.       Plaintiffs National Audubon Society, American Bird Conservancy, Center for

Biological Diversity, and Defenders of Wildlife (collectively the "conservation organizations")

1

hereby challenge as unlawful and arbitrary and capricious the December 22, 2017 Solicitor's Memorandum M-37050, which was issued by the office of the Solicitor of the Department of the Interior ("DOI") and reverses Defendants DOI's and the U.S. Fish and Wildlife Service's ("FWS" or "Service") longstanding interpretation and implementation of the Migratory Bird Treaty Act of 1918, 16 U.S.C. § 703(a) ("MBTA" or "Act"). For decades Defendants have construed the MBTA, consistent with its plain language, as protecting migratory bird populations from foreseeable "incidental" killing or "take" caused by major industrial activities that are not specifically directed at migratory birds but nevertheless kill them in large numbers. This interpretation has helped to conserve migratory birds for decades in keeping with the purpose of the MBTA and the international treaties the Act implements. The recent Solicitor's Memorandum, however, which is currently being implemented by DOI and its constituent agencies, including FWS, declares that only activities deliberately intended to kill or take migratory birds (such as hunting) may be the subject of regulation or enforcement under the MBTA. *See* Solicitor's Memorandum M-37050 – *The Migratory Bird Treaty Act Does Not Prohibit Incidental Take* (hereafter "Memorandum").

2.     The MBTA broadly provides that "it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird, any part, nest, or egg of any such bird, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof." 16 U.S.C. § 703(a).

2

3.      In light of the expansive language and underlying purpose of the MBTA and the treaties it implements, Defendants have for decades refused to construe the MBTA as a statute that imposes liability only when an activity is specifically directed at killing or taking birds. Thus, actions that proximately and foreseeably cause the "take" or "kill" of a migratory bird have long been deemed by Defendants to violate the MBTA. This included industrial activities that foreseeably kill and/or injure migratory birds incidental to otherwise lawful conduct not specifically targeted at birds.

4.      In keeping with this understanding of the statute, the FWS, acting through the U.S. Department of Justice, has successfully brought numerous enforcement actions, for example when large bird kills have predictably resulted from the operation of oil pits, waste treatment lagoons, power lines, communication towers, and wind turbines. The Service and Justice Department have also held parties responsible for MBTA violations stemming from avoidable environmental disasters like the *Exxon Valdez* and *Deepwater Horizon* oil spills.

5.      Proactively, the Service has exercised its authority under the MBTA to work with industry and conservation organizations to develop best management practices that reduce or eliminate the incidental take of migratory birds. This has included collaborative efforts to reduce take from communication towers, power lines, wind turbines, and long line fisheries, as well as the development of measures to prevent bird losses at solar power plants. *See, e.g.*, U.S. Fish & Wildlife Serv., Land-Based Wind Energy Guidelines, March 23, 2012, *available at* https://www.fws.gov/ecological-services/es-library/pdfs/WEG_final.pdf. These efforts were intended to protect migratory birds and at the same time provide reasonable assurances to industries that sought to avoid or minimize their impacts to migratory birds that they would likely not be subject to prosecution.

6.     On December 22, 2017, without any advance notice to the public or any opportunity for public comment, DOI's Acting Solicitor issued an interpretation of the MBTA that completely reverses this longstanding practice and policy. Jettisoning Defendants' and the Justice Department's many decades of enforcement and mitigation efforts to avoid or limit incidental take under the MBTA by industrial activities that predictably kill and injure large numbers of migratory birds, the Memorandum asserts for the first time in Defendants' history that the MBTA's scope does not include incidental take of migratory birds, and that the FWS is therefore powerless to use the Act to mitigate the impact of major industrial activities on migratory birds.

7.     In light of the Memorandum, it is now the official position of Defendants that MBTA liability attaches only to those acts taken with the specific intent to take or kill migratory birds. Accordingly, industrial actors need no longer take *any* precautions to avoid incidentally killing or injuring migratory birds, even when it is inevitable that industrial activities will, in fact, harm migratory birds and have a far more deleterious effect on migratory birds than hunting and similar intentional actions specifically directed at migratory birds, and even when relatively modest and inexpensive measures could be employed to prevent or ameliorate such adverse impacts.

8.     The Solicitor's Memorandum represents the DOI's formal position and is therefore binding on the Service and all federal agencies within DOI. It is a final agency action from which important legal, policy, and practical consequences flow because, under the Memorandum, the Service can no longer refer for prosecution anyone for actions that incidentally kill or take migratory birds, no matter how egregious or reckless the conduct and how easy it might be to avoid the harmful consequences. Nor can DOI or the FWS any longer

4

invoke the MBTA, as they have many times in the past, to reach reasonable accommodations with industry to ameliorate adverse impacts on protected migratory bird populations which are a public resource. FWS has already implemented the Memorandum in official advice to potential violators of the MBTA and has also issued an April 11, 2018 "Service Directorate" providing "Guidance" on "what changes to prior [agency] practices should be made in light of the" Memorandum.

9.      The Memorandum, which has been severely criticized by former DOI and FWS officials from both Republican and Democratic Administrations, is contrary to the plain language and fundamental purpose of the MBTA and the treaties it implements, and it unlawfully and improperly reverses Defendants' own long-standing interpretation and implementation of the Act. Such a sweeping reversal of longstanding agency interpretation and policy requires notice and comment rulemaking and compliance with the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA"), none of which occurred here.

10.     Plaintiffs seek a judicial declaration that Defendants' adoption and implementation of the Memorandum exceeds the agency's statutory authority, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law or procedure required by law. 5 U.S.C. § 706. In addition, Plaintiffs request that the Court vacate the Memorandum and declare that Defendants must revert to their prior, correct longstanding interpretation and policy.

## JURISDICTION AND VENUE

11.     This action is brought under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (APA).

12.     The Memorandum is "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704, *see also* 209 DM 3.2(A)(11) (delegating to the Solicitor the authority to "issue final legal interpretations in the form of M-Opinions … which shall be binding, when signed, on all other Departmental offices and officials").

13.     This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (Federal question) and 28 U.S.C. § 1346 (United States as defendant). Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1)(B) because the challenged agency action sanctions the incidental taking and killing of birds within this jurisdiction; Defendant federal agencies are relying on the Memorandum in the exercise of their legal authority within this jurisdiction; and Plaintiff National Audubon Society is incorporated and has its headquarters in this jurisdiction.

14.     This Court has the authority to grant Plaintiffs' requested relief under the APA, 5 U.S.C. §§ 705-06, and the Declaratory Judgment Act, 28 U.S.C. § 2201-02. An actual controversy within the meaning of the Declaratory Judgment Act exists between the parties.

## PARTIES

## PLAINTIFFS

15.     Plaintiff National Audubon Society, Inc. ("Audubon") is a national nonprofit conservation organization exempt from tax under Section 501(c)(3) of the Internal Revenue Code dedicated to protecting birds and the places they need, today and tomorrow, throughout the Americas using science, advocacy, education, and on-the-ground conservation. Founded in 1905, Audubon has over 1.2 million members nationwide, including 64,719 members in New York where it is incorporated. Among its many activities, Audubon operates 41 nature centers, has 23 state programs, and over 450 local chapters throughout the country, including 27 in New York. Audubon, its chapters, and its members played a significant role advocating for the passage of

the Migratory Bird Treaty Act in 1918. Since then, the MBTA has been a foundation for nearly all of Audubon's activities and goals providing baseline protections for most of the nation's native bird species, thereby enabling Audubon to achieve its mission of protecting birds and the places they need.

16.    Plaintiff American Bird Conservancy ("ABC") is a 501(c)(3) non-profit conservation organization whose mission is to conserve native birds and their habitats throughout the Americas. ABC pursues this mission by safeguarding the rarest bird species, restoring habitats, and reducing threats to bird species. ABC's more than 8,000 individual members, as well as its staff, board members, donors, and supporters, enjoy observing, studying, and photographing migratory birds throughout the country, including in New York. ABC is a leading organization working to reduce threats to birds from habitat destruction; from collisions with buildings, towers, and wind turbines; from toxins such as hazardous pesticides and lead, and myriad other threats. ABC pursues its goals through scientific research and analysis; advocating for bird conservation at the local, state, regional, and federal levels; forming bird conservation partnerships with other organizations throughout the northern and southern hemispheres; and advocating for meaningful regulatory changes to address threats to birds effectively through various means, including the submission of rulemaking petitions.

17.    Plaintiff Center for Biological Diversity ("Center") is a 501(c)(3) corporation that is headquartered in Tucson, Arizona, with offices in various locations throughout the country. The Center works through science, law, and policy to secure a future for all species, great or small, including many species of migratory birds. The Center is actively involved in efforts to conserve migratory birds and their habitat. The Center has more than 63,000 members throughout the United States and the world, including more than 4,300 in New York.

18.     Plaintiff Defenders of Wildlife ("Defenders") is a non-profit membership organization headquartered in Washington, D.C. with field offices throughout the country. Founded in 1947, Defenders is a science-based conservation organization with over 340,000 members nationwide, including more than 26,000 in New York. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities and the preservation of the habitats on which they depend. Defenders advocates for new approaches to wildlife conservation that will help keep species from becoming endangered, and it employs education, litigation, research, legislation and advocacy to defend wildlife and habitat. Defenders is one of the nation's leading advocates for endangered species and wildlife conservation.

19.     Plaintiffs' members have vital interests in the preservation of migratory birds and rely on the Plaintiff organizations to advocate for those interests. Plaintiffs have long worked to educate their members, supporters, and the public about the negative impacts of incidental take on migratory bird populations.

20.     On behalf of their members, the Plaintiff conservation organizations are dedicated to the protection of America's wildlife heritage, including the conservation of migratory birds. Many of Plaintiffs' members regularly observe, study, photograph, and otherwise enjoy migratory birds in the wild. Plaintiffs and their members are therefore gravely injured by the Solicitor's Memorandum, which has far reaching effects that impact their ability to study, enjoy, and protect migratory birds. The Memorandum already has had, and will continue to have, significant on-the-ground effects on Defendants' activities, in a manner that is highly detrimental to the interests of Plaintiffs and their members. Likewise, industrial sectors that have sought to avoid and/or minimize impacts on migratory birds in the past have already relied, and will

continue to rely, on the Memorandum in a manner that is highly detrimental to the interests of Plaintiffs and their members.

21.     The legal violations alleged in this Complaint cause direct injury to the scientific, aesthetic, recreational, educational, and conservation interests of the Plaintiffs and their members. As a result of Defendants' abdication of any authority to enforce or apply the MBTA to the foreseeable incidental take of migratory birds by industrial activities, Defendants have removed the obligation of industries to reduce or eliminate their impacts on migratory birds. Defendants' unlawful and arbitrary actions immediately and directly harms Plaintiffs' members' interests in viewing, studying, and otherwise benefitting from migratory birds.

22.     The Memorandum is already being followed by the FWS and other components of DOI as a mandatory directive, and is therefore already having on-the-ground impacts on members of the Plaintiff organizations. For example, to the detriment of Plaintiffs' members, FWS field offices, relying on the Memorandum, have told one or more companies constructing natural gas pipelines that they may cut down trees with nesting birds during the breeding season. In another instance, a company constructing such a pipeline requested that the FWS reverse its position on when tree clearing can occur since the Memorandum declares that the companies have no potential MBTA liability regardless of how many migratory birds they kill or injure by cutting down trees with active nests. Plaintiffs have members who reside and/or recreate in specific locations where such activities are occurring, and whose concrete interests in observing, studying, and enjoying migratory birds are, and will continue to be, impaired by these activities, which would not have occurred but for the Memorandum.

23.     Further compounding the harm to Plaintiffs' members, on April 11, 2018, the Principal Deputy Director of the FWS sent to other Service personnel a directive entitled

"Guidance on the recent M-opinion affecting the Migratory Bird Treaty Act" (hereafter "FWS Guidance"). According to the FWS, the Guidance "ensure[s] consistency" with the Memorandum by telling FWS employees that the Memorandum "means that the MBTA's prohibitions on take apply" only "when the *purpose* of an action is to take migratory birds, their eggs, or their nests" (emphasis in original) so that, for example, destroying migratory bird nests with full knowledge that they are occupied by nestlings or eggs would not violate the MBTA's prohibition on the taking or killing of migratory birds so long as the killing of the nestlings or destruction of the eggs is not the intended purpose of the conduct. The Memorandum, as implemented by the FWS Guidance, is harming, and will continue to harm in the immediate and foreseeable future, Plaintiffs' members' concrete interests in observing, studying, and enjoying migratory birds.

24.    Additionally, Defendants' new position as embodied in the Memorandum and implemented by the FWS Guidance has undermined federal support for and involvement in the continued development of best management practices to reduce the take and kill of migratory birds by wind and solar energy facilities, among others. Consequently, the Memorandum and FWS Guidance implementing it are harming, and will continue to harm, the Plaintiff organizations by requiring them to divert their limited resources and personnel in an attempt to fill the gap left by the federal government's abandonment of efforts to implement the MBTA so as to mitigate the impact of industrial activities on migratory birds.

25.    By failing to follow the notice and comment rulemaking process as required by the APA, and by failing to engage in any analysis of environmental impacts as required by NEPA, Defendants have violated the rights of Plaintiffs and their members, and have also

deprived Plaintiffs and their members of information to which they are entitled and would have received had Defendants complied with the required legal processes.

## DEFENDANTS

26.    Defendant DOI has ultimate responsibility for the administration and implementation of the MBTA.

27.    Defendant FWS is a federal agency within DOI that is authorized and required by law to protect and manage the fish, wildlife, and native plant resources of the United States. FWS implements and enforces the MBTA and has primary authority for its day-to-day administration.

28.    Defendant Daniel Jorjani is the Principal Deputy Solicitor of the Interior and signed the challenged legal opinion as the person exercising the authority of the Solicitor of the Interior Department. Plaintiffs sue Jorjani solely in that professional capacity.

## BACKGROUND

### Statutory Background

29.    In 1916, Great Britain, acting on behalf of Canada, and the U.S. entered into an agreement to establish a "uniform system of protection" for migratory birds. *See* Convention Between the United States and Great Britain for the Protection of Migratory Birds, proclamation, Aug. 16, 1916, 39 Stat. 1702 (the "Canada Convention"). The Canada Convention addressed a "national interest of very nearly the first magnitude," *Missouri v. Holland*, 252 U.S. 416, 435 (1920), and "recited that many species of birds in their annual migrations traversed certain parts of the United States," but "were in danger of extermination through lack of adequate protection." *Id.* at 431.

30.     The Canada Convention recognized that migratory birds provided a "great value as a source of food or in destroying insects," but were "in danger of extermination." Canada Convention.

31.     To fulfill the obligations enumerated in the Canada Convention, Congress passed the MBTA in 1918.  16 U.S.C. § 703-12. As passed at that time, the MBTA declared that "unless and except as permitted by regulations made as hereinafter provided, it shall be unlawful to hunt, take, capture, kill, attempt to take, capture or kill, possess, offer for sale, sell, offer to purchase, purchase, deliver for shipment, ship, cause to be shipped, deliver for transportation, transport, cause to be transported, carry or cause to be carried by any means whatever, receive for shipment, transportation or carriage, or export, at any time or in any manner, any migratory bird…or any part, nest, or egg of any such bird."  Act of July 3, 1918, ch. 128, § 2, 40 Stat. 755 (codified as amended at 16 U.S.C. § 703(a)).

32.     Since enactment of the MBTA, the United States has entered into three additional treaties concerning the conservation of migratory birds—with Mexico, Japan, and the former Soviet Union.

33.     In 1936, the U.S. and Mexico entered into the Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, 50 Stat. 1311 (the "Mexico Convention"). That treaty declared the parties' intent to protect migratory birds through "adequate methods which will permit, in so far as the… parties may see fit, the utilization of said birds rationally for purposes of sport, food, commerce, and industry." Mexico Convention, art. I.

34.     Congress promptly amended the MBTA to incorporate that agreement.  *See* Migratory Bird Treaty Act, amendment, 49 Stat. 1555 (June 20, 1936). The clause "at any time or in any manner" was moved to the beginning of the MBTA's prohibitory list along with the

phrase "by any means." Migratory Bird Treaty Act, amendment, 49 Stat. 1555, 1556, § 3 (June 20, 1936). The term "pursue" was also added to the prohibitory list. Since then, the MBTA has provided that: "Unless and except as permitted by regulations made as hereinafter provided in this subchapter, it shall be unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture or kill" migratory birds. 16 U.S.C. § 703(a).

35.     In 1972, the U.S. and Japan agreed to the Convention for the Protection of Migratory Birds and Birds in Danger of Extinction, and Their Environment, Mar. 4, 1972, 25 U.S.T. 3329, T.I.A.S. No. 7990 (the "Japan Convention"). In addition to calling for each party to prohibit take of shared migratory species, the Convention broadly called for the parties to prevent damage to birds from pollution. *See* Japan Convention, art. VI.

36.     The MBTA was amended on June 1, 1974 to incorporate the Japan Convention. Act of June 1, 1974, Pub. L. No. 93-300, 88 Stat. 190.

37.     In 1978, the U.S. and the Union of Soviet Socialist Republics signed the Convention Concerning the Conservation of Migratory Birds and Their Environment, Oct. 13, 1978, 29 U.S.T. 4647, T.I.A.S. No. 9073 (hereinafter "Russia Convention"). The Russia Convention prohibited take and broadly called for the parties to prevent damage to birds from pollution. *See* Russia Convention, art. IV; *see also* 72 Fed. Reg. 8931, 8946 ("The Japan and Russia treaties each call for implementing legislation that broadly prohibits the take of migratory birds.").

38.     The MBTA was amended to incorporate the Russia Convention in 1989. *See* North American Wetlands Conservation Act, Pub. L. No. 101-233, § 15, 103 Stat. 1968 (1989).

39.     In 1995, Canada and the U.S. negotiated substantial modifications to the original Canada Convention. *See* Protocol Between the Government of the United States and the

Government of Canada Amending the 1916 Convention Between the United Kingdom and the United States of America for the Protection of Migratory Birds, Dec. 5, 1995, S. Treaty Doc. No. 104-28. The revised convention requires the countries to "seek means to prevent damage to such birds and their environments, including damage from pollution." *Id*. art. IV.

40.     The Mexico Convention was similarly modified in 1997. *See* Protocol Between the Government of the United States of America and the Government of the United Mexican States Amending the Convention for the Protection of Migratory Birds and Game Mammals, May 5, 1997, S. Treaty Doc. No. 105-26.

### Subsequent Acts of Congress Reinforce that the MBTA's Prohibitions Apply To Industrial Activities That Foreseeably Kill and Take Migratory Birds

41.     Congress has carved out several narrow exceptions from the MBTA's broad prohibition on "take" and "kill" regardless of any specific intent to harm birds.

42.     In 1960, Congress specified that any violation of the law's prohibitions constituted misdemeanor offenses, with the exception of the commercial use of listed species, which was punishable as a felony.  *See* Act of Sept. 8, 1960, Pub. L. No. 86-732, 74 Stat. 866.

43.     In 1986, following a Sixth Circuit ruling that the MBTA's strict liability felony provisions violated due process, *U.S. v. Wulff*, 758 F.2d 1121 (6th Cir. 1985), Congress contracted the statute's felony reach to only "knowing" violations. *See* Emergency Wetlands Resources Act of 1986, Pub. L. 99-645, § 501, 100 Stat. 3590 (amending 16 U.S.C. § 707(b)). Congress left untouched the Act's misdemeanor provision, which provides that "*any* person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor . . . ." 16 U.S.C. § 707(a) (emphasis added).

44.     Twelve years later, Congress eliminated strict liability for the specific practice of baiting birds (i.e., the practice of spreading grain or other bait on a field to attract birds), by making it unlawful to "take any migratory [] bird by the aid of baiting, or on or over any baited area, if the person knows or reasonably should know that the area is a baited area." Migratory Bird Treaty Reform Act of 1998, Pub. L. 105-312, § 102, 112 Stat. 2956 (codified at 16 U.S.C. § 704(b)(1)). Again, however, Congress left unaltered the Act's general misdemeanor provision, which does not impose any intent requirement before liability may be imposed.

45.     In 2002, Congress even more explicitly reinforced that the MBTA encompasses incidental take by exempting only certain narrowly defined military readiness activities from the MBTA's general protections. In response to the court's holding in *Ctr. for Biological Diversity v. Pirie*, 191 F. Supp. 2d 161 (D.D.C. 2002), that military drills that incidentally killed migratory birds violated the MBTA, Congress exempted military readiness activities on a temporary basis from liability for incidental take under the MBTA. Congress excluded routine installation support activities and the "operation of industrial activities" by the military from the exemption from incidental take liability. Congress simultaneously directed DOI to promulgate regulations *under the MBTA* to insulate military readiness activities from incidental take liability provided that the military adopted suitable regulations to monitor and minimize impacts on migratory birds. *See* Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. 107-314, div. A, title III, § 315, 116 Stat. 2509. Congress would not have directed DOI to exercise its authority *under the MBTA* to adopt such regulations if DOI lacked authority to regulate incidental take in the first instance.

46.     FWS issued regulations in 2007 that exempt the Armed Forces from liability for the incidental take of migratory birds during military readiness exercises so long as the military

"cooperate[s] with the Service to develop and implement appropriate conservation measures to minimize or mitigate . . . significant adverse effects." 50 C.F.R. § 21.15(a)(1). The regulations provide that, if the FWS determines that "incidental take of migratory birds during a specific military readiness activity likely would not be compatible with one or more of the migratory treaties, the [FWS] will suspend authorization of the take associated with that activity." *Id.* § 21.15(b)(1). In adopting these regulations following notice and comment rulemaking, the FWS stated that Congress had "determined that allowing incidental take of migratory birds as a result of military readiness activities is consistent with the MBTA" so long as the "Armed Forces give appropriate consideration to the protection of migratory birds when planning and executing military readiness activities." 72 Fed. Reg. 8932 (Feb. 28, 2007). The regulations do not affect the liability of the Armed Forces or others for incidental take or killing outside of the military readiness context.

### For Decades, Defendants Consistently Interpreted the MBTA to Prohibit Foreseeable Incidental Killing or Taking Migratory Birds Without FWS Authorization

47.     For more than seventy years, the FWS construed, and the government enforced, the MBTA as a statute that applies regardless of the actor's specific intent to take or kill migratory birds. *See, e.g.*, *U.S. v. Schultze*, 28 F. Supp. 234, 236 (D. Ky. 1939) (holding that the defendants were liable for taking doves over baited field although there was no evidence that the defendants knew the field was baited, and endorsing the government's position that "[i]n view of the broad wording of the act, and the evident purpose behind the treaty and the act . . . it was not the intention of Congress to require any guilty knowledge or intent to complete the commission of the offense, and that accordingly scienter is not necessary"); *U.S. v. Reese*, 27 F. Supp. 833 (W.D. Tenn. 1939) (same).

48.     Since the 1970s, FWS, acting through the Department of Justice, has brought
many enforcement actions under the MBTA outside of the hunting and poaching context. These
criminal enforcement actions have targeted incidental take resulting from industrial activities that
foreseeably and predictably kill  migratory birds, such  as operating oil pits without precautions
to protect  birds, *U.S. v. Stuarco Oil Co.*, No. 73-CR-129 (D. Colo. Aug. 17, 1973), misapplying
pesticides in areas known to be frequented by birds, *U.S. v. Corbin Farm Servs.*, 444 F. Supp.
510 (E.D. Cal. 1978), *aff'd on other grounds*, 578 F.2d 259 (9th Cir. 1978), operating
contaminated waste treatment ponds in the absence of any measures to safeguard birds, *U.S. v.
FMC Corp.*, 428 F. Supp. 615 (W.D. N.Y. 1977), *aff'd*, 572 F.2d 902 (2nd. Cir. 1978), and
erecting power lines in areas with high concentrations of migratory birds, *United States v. Moon
Lake Elec. Ass'n*, 45 F. Supp. 2d 1070 (D. Colo. 1999).

49.     In *FMC Corp.*, 572 F.2d 902, the Second Circuit upheld the misdemeanor
conviction of a corporation for killing nearly 100 birds by releasing a highly toxic pesticide into
a pond. The court sustained the government's position that the corporation was liable
notwithstanding the fact that the corporation did not intend to kill the birds and insisted that it did
not know the pesticide was even harmful to birds. *Id*. at 905. The Court of Appeals explained
that "when a person engages in extrahazardous activities"—in that case the company's
manufacturing of a pesticide "known to be highly toxic" and then "fail[ing] to act to prevent this
dangerous chemical from reaching the pond where it was dangerous to birds and other living
organisms"—the corporation could be held liable under the MBTA just as it would be under
established principles of tort law. *Id*. at 907. The court held that, while "[i]mposing strict liability
on FMC in this case does not dictate that every death of a bird will result in imposing strict
criminal liability on some party," affirming the corporation's misdemeanor conviction was

17

required because "the statute does not include as an element of the offense 'willfully, knowingly, recklessly, or negligently'; implementation of the statute will involve only relatively minor fines; Congress recognized the important public policy behind protecting migratory birds; FMC engaged in an activity involving the manufacture of a highly toxic chemical; and FMC failed to prevent this chemical from escaping into the pond and killing birds." *Id.* at 908.

50.     The MBTA has also been invoked to charge companies for the environmental damage wrought by oil spills such as the *Exxon Valdez* and *Deepwater Horizon* disasters. *See* Judgment, *U.S. v. BP Exploration and Prod., Inc*, 2:12-cr-00292-SSV-DEK (E.D. La. Jan. 29, 2013); Stephen Raucher, *Raising the Stakes for Environmental Polluters: The Exxon Valdez Criminal Prosecution*, 19 Ecology L. Q. 1 (Jan. 1992).

51.     On April 15, 2003, Steve Williams, the Director of FWS during the Administration of George W. Bush, issued a Migratory Bird Permit Memorandum to "clarify the application of the [MBTA] to migratory bird nest destruction, and to provide guidance for advising the public." Director Williams stated that the "public should be made aware that, while destruction of a nest by itself is not prohibited under the MBTA, nest destruction that results in the unpermitted take of migratory birds or their eggs is illegal and fully prosecutable under the MBTA . . . For example, colonial nesting birds are highly vulnerable to disturbance; the destruction of unoccupied nests during or near the nesting season could result in a significant level of take. Another example involves ground nesting species such as burrowing owls and bank swallows, which nest in cavities in the ground, making it difficult to detect whether their nests are occupied by eggs or nestlings or are otherwise still essential to the survival of the juvenile birds." Accordingly, Director Williams instructed that the "Service should make every effort to raise public awareness regarding the possible presence of birds and the risk of violating the

MBTA . . . and should inform the public of factors that will help minimize the likelihood that take would occur should nests be destroyed (i.e., when active nesting season normally occurs)." Consistent with that understanding of the MBTA, FWS personnel for many years worked with project developers to avoid and minimize the destruction of nests during active nesting and breeding seasons.

52.    In addition to administering a permit program for hunting and other specific forms of purposeful take of migratory birds, FWS also administers a "Special Purpose Permit" system for activities that fall outside the scope of specific MBTA permit types. *See* 50 C.F.R. § 21.27. In adopting regulations regarding incidental take associated with military preparedness activities, FWS stated that "[s]pecial purpose permits may be issued for actions whereby take of migratory birds could result as an unintended consequence . . . ." 72 Fed. Reg. at 8947. When an activity will result in the incidental take of an endangered or threatened species that is also protected by the MBTA, the FWS's longstanding practice has been to issue an Incidental Take Permit under Section 10(a)(1)(B) of the Endangered Species Act ("ESA") that "also constitutes a[n] MBTA Special Purpose Permit under 50 C.F.R. § 21.27," so that any take authorized under the ESA "will not be in violation of [the MBTA]." *Habitat Conservation Planning and Incidental Take Permit Processing, Appendix 5 – FWS Guidance on Addressing Migratory Birds and Eagles (FWS Only)* (Nov. 4, 1996). FWS has also issued Special Purpose Permits for take of migratory birds incidental to invasive species removal projects and longline fishing activities. 77 Fed. Reg. 50153 (Aug. 20, 2012).

53.    Short of formal permitting, FWS has used the MBTA's enforcement authority to develop best management practices for industries that foreseeably kill and injure migratory birds in the course of their routine operation of electricity transmission lines, communication towers,

wind turbines, and solar panels. *See, e.g.*, U.S. Fish and Wildlife Service, Land-Based Wind Energy Guidelines (Mar. 23, 2012); Multiagency Avian-Solar Collaborative Working Group, available at http://blmsolar.anl.gov/program/avian-solar/. These voluntary guidelines have helped to reduce impacts on migratory birds by the specified industries and compliance with their terms has factored into FWS' MBTA enforcement decisions.

54.     Plaintiffs played an active role and expended considerable organizational resources in developing and improving many of these best practices and have continued to engage with ongoing efforts to update existing guidelines and develop take-reducing measures for other industries. For example, Audubon and Defenders actively engaged in the collaborative processes of the Federal Advisory Committee for Wind Energy Guidelines, which had as its mission to "provide advice and recommendations to [DOI] on developing effective measures to avoid or minimize impacts to wildlife and their habitats related to land-based wind energy facilities." The Wind Energy Guideline Federal Advisory Committee was convened at the behest of FWS and included industry, government, and conservation interests. The resulting published Guidelines establish a number of best management practices to help wind energy developers and operators avoid taking migratory birds. Audubon and Defenders assisted in the formulation of the Guidelines, and ABC and the Center submitted extensive comments on them. In issuing the Guidelines, FWS made clear that they did not absolve companies of potential liability for killing migratory birds, but that compliance with the Guidelines would factor into FWS's and Justice Department's enforcement decisions.

55.     Defenders participated in the National Wind Coordinating Committee, which, as a forum for government, industry, academics, and conservation organizations, disseminated available scientific research on wind-wildlife interactions. Defenders and the Center have also

participated extensively in the Avian Solar Work Group, a collaborative enterprise of utilities, solar companies, and conservation organizations developed to advance research to better understand how birds interact with solar facilities. ABC played a major role in the development of FWS guidelines for the protection of birds affected by communications towers, which have killed millions of migratory birds. The FWS's involvement in, and support for, these collaborative efforts  further underscored the agency's understanding that the MBTA applies to incidental take associated with major industrial activities that foreseeably kill migratory birds.

56.     On December 14, 2011, ABC submitted a rulemaking petition to DOI/FWS requesting the issuance of permitting regulations under the MBTA that would regulate the impacts of industrial wind power projects on migratory birds.  *See* ABC, *Rulemaking Petition to the U.S. Fish and Wildlife Service for Regulating the Impacts of Wind Energy Projects on Migratory Birds* (Dec. 14, 2011) ("2011 Petition"). The Petition maintained that MBTA regulations establishing a permitting system for the killing of migratory birds by industrial wind projects would benefit migratory birds while allowing appropriately sited and operated wind power projects to proceed in compliance with the MBTA and underlying international treaties. ABC's extensive legal analysis showed that FWS has the legal authority under the MBTA to issue permitting regulations for industrial activities that foreseeably result in the killing of migratory birds. The Petition cited the plain language and broad purpose of the MBTA and underlying treaties, as well as a number of court rulings and the federal government's own past actions and pronouncements over the course of several decades, to show that industrial activities that foreseeably result in the deaths of migratory birds are covered by the MBTA.

57.     FWS responded to ABC's Petition by letter dated March 22, 2012. FWS stated that "ABC's analysis of the case law regarding incidental take under the MBTA is thorough" and

that "[i]ncidental take under the [MBTA] has traditionally been addressed through a combination of enforcement and prosecutorial discretion as well as voluntary partnerships with various entities, such as the Avian Powerline Interaction Committee[] addressing transmission and distribution lines, and communication tower guidelines." Hence, the FWS agreed with ABC's analysis regarding the agency's legal authority and stated that the "Service has been examining approaches to developing incidental take regulations under the MBTA." FWS denied ABC's rulemaking petition because the FWS was still assessing the efficacy of "voluntary guidelines" that the FWS had adopted for wind power projects. FWS stated that "[i]n the future, we will compile information from wind-industry facilities that are implementing the [voluntary guidelines]. This will provide us with data to better assess the potential impact of wind-energy facilities on migratory bird populations. That data and further analysis and discussion with partners like ABC, will help determine if further agency action may be warranted."

58.   ABC submitted a revised rulemaking Petition in 2015, again seeking a mandatory permit program for incidental take of migratory birds by wind energy projects. The Petition again noted the absence of any mechanism for the FWS to authorize incidental take by wind power projects and that incidental take was prohibited absent such regulation.

59.   On May 26, 2015, FWS published a Notice of Intent ("NOI") to undertake a programmatic Environmental Impact Statement ("EIS") in connection with a rulemaking for the establishment of an incidental take permitting system under the MBTA. 80 Fed. Reg. 30032. Explaining DOI/FWS's "longstanding position" that the "MBTA applies to take that occurs incidental to, and which is not the purpose of an otherwise lawful activity," and that "sources of avian mortality are becoming more prevalent across the landscape" and "contributing to continental-scale population declines for many species," the NOI sought public input on the

design of a regulatory system to permit incidental take by industry sources. 80 Fed. Reg. 30033-34.

60.     In anticipation of that rulemaking, on January 10, 2017, DOI's Office of the Solicitor ("Solicitor") released Opinion M-37041 – *Incidental Take Prohibited Under the Migratory Bird Treaty Act,* ("Opinion M-37041"). This 30-page analysis reaffirmed and formalized Defendants' long-held position that the MBTA prohibits the foreseeable incidental take of migratory birds, and explained  how the statute's plain language and purpose, the underlying treaties, and the weight of pertinent case law all strongly support that position. Opinion M-37041 also pointed out that "[i]n many cases, simple, relatively low-cost methods have proven effective in reducing the impacts of these activities on migratory birds," including, *e.g.*, "replacing non-flashing warning lights on communication towers with flashing lights; marking power lines with bird diverters; implementing greater spacing of insulators on power poles and other practices to reduce electrocution hazards of power lines; fencing and netting waste pits; updating mining operations to eliminate the use of tailing ponds, and employing streamer lines on longline fishing vessels to reduce seabird catch."  Opinion M-37041 explained that such modest measures could significantly reduce adverse impacts on migratory birds, thus reinforcing the importance of interpreting the MBTA, as DOI/FWS have for decades, as applying to foreseeable incidental take in appropriate circumstances.

### Defendants' Abrupt Reversal

61.     On February 6, 2017, shortly after taking office, the new Administration suspended Opinion M-37041 "pending review." Letter from Acting Secretary to Acting Solicitor, *Temporary Suspension of Certain Solicitor M-Opinions Pending Review*.

62.     Representatives of the oil and gas industry, among others, then lobbied DOI to issue a new directive that would eviscerate any obligation to take migratory bird impacts into consideration when engaging in various industrial activities. For example, on August 31, 2017, the Western Energy Alliance, which represents oil and natural gas companies, sent Secretary of the Interior Ryan Zinke a letter complaining that the "implementation and enforcement of incidental take of migratory birds (including nests and their habitat) . . . is inhibiting oil and natural gas development." The letter urged Secretary Zinke to issue "guidance that [the] MBTA does *not* give FWS the authority to regulate incidental take for [sic] migratory birds." On November 3, 2017, the Director of Government Relations for the Independent Petroleum Association of America wrote to the Deputy Director of DOI's Office of External Affairs with the subject line "MBTA," asking "Any word on the solicitor's opinion yet?"

63.     In response to such lobbying by representatives of the oil and gas industry, and without soliciting or considering any public comment under the APA or NEPA, on December 22, 2017, the new Solicitor's Office released Memorandum M-37050, reversing Defendants' longstanding interpretation of incidental take under the MBTA. The Memorandum states that "take" refers only to "affirmative actions that have as their purpose the taking or killing of" birds. Under this new directive, only bird deaths that occur in the course of hunting and poaching or similar activities, the precise purpose of which is the killing or taking of migratory birds, are covered. According to the Memorandum, an activity does not violate the MBTA, regardless of how many birds it foreseeably kills or its overall impact on migratory bird populations, so long as the activity is undertaken without an "affirmative" intention to kill or take birds. The Memorandum "permanently withdraws and replaces" Opinion M-37041.

64. The Memorandum represents, and is being treated by Defendants as, a "final legal interpretation" that is binding on all offices within DOI. DOI Departmental Manual, 209 DM 3.2A (11). Accordingly, on December 22, 2017, the Principal Deputy Director of FWS informed FWS personnel that "[t]oday, the Department of the Interior Solicitor's Office issued a binding opinion that will change the way [FWS] implements and enforces the [MBTA]." Among other immediate actions to implement the Memorandum, FWS has publicly announced that it has suspended all investigations of incidental take.

65. Defendants' reversal of policy removes any legal requirement for actors to eliminate, minimize, or mitigate their activities' foreseeable impacts on migratory birds, including birds that are actively breeding and nesting. For example, the Service recently cited the Memorandum when it authorized an energy company, DTE Midstream Appalachia, to continue vegetative clearing for parts of the Birdsboro Pipeline project in Berks County, Pennsylvania, during specific time periods during the nesting season that the Service had originally said should be off-limits to such clearing in order to protect actively nesting birds. In granting the extension, the Service said  that it was relying on the Memorandum in declaring that the MBTA's prohibitions "do not apply to incidental take" so that actively nesting migratory birds and their chicks and eggs could now be killed or injured with impunity, whereas previously the project developer had to at least avoid cutting trees during nesting season.  *See* Letter from Robert M. Anderson, Acting Field Office Supervisor, FWS, to Angela M. Gun, GAI Consultants, Inc., Re: USFWS Project # 2016-1019, Birdsboro Pipeline Project, DTE Midstream Appalachia, LLC (Mar. 12, 2018).

66. The Memorandum is undermining the FWS's own recent efforts to reduce the adverse impacts of industrial wind projects on migratory birds, as evidenced by the Service's

recent publication in the Federal Register of new paperwork reduction guidelines for the

Service's Land-Based Wind Energy Guidelines. 57 Fed. Reg. 12808 (Mar. 23, 2018). These

Guidelines were developed by the Service, industry groups, and conservation groups as a

voluntary program intended to reduce incidental take of migratory birds and other wildlife.

Companies that followed the Guidelines to avoid or minimize harming migratory birds received

assurances from FWS that such actions would be considered when FWS and the Justice

Department made decisions on enforcing the Act. The new paperwork reduction guidelines state:

"Following the Guidelines does not relieve any individual, company, or agency of the

responsibility to comply with applicable laws and regulations (i.e., species protected by the

Endangered Species Act and/or Bald and Golden Eagle Protection Act (16 U.S.C. 668-668c))."

*Id.* at 12809. The MBTA is conspicuous by its absence as an "applicable law and regulation"

because the Service, relying on the Memorandum, now takes the position that the wind industry

has no obligation to reduce incidental take. This reversal of position on the ability to reasonably

enforce the MBTA undermines the core rationale for the Guidelines and undercuts the central

motivation for wind power companies to follow the Guidelines.

  67. On information and belief, among other immediate adverse impacts, the Service is

no longer asking industries that were formerly collecting information on incidental migratory

bird impacts to do so. Without collecting information on migratory bird deaths and other

impacts, it will be far more difficult to ensure proper siting of wind turbines, solar arrays, and

other facilities. The absence of reported data will hinder the efforts by Defendants as well as

Plaintiffs to conserve and recover bird species.

  68. The April 11, 2018 FWS Guidance states that FWS is immediately "modifying"

its "policies and practices within its programs" to implement the Memorandum's new approach

to MBTA liability. According to the Guidance, the M-Opinion "means that the MBTA's prohibitions on take apply when the *purpose* of an action is to take migratory birds, their eggs, or their nests" (emphasis in original), so that whether a particular action violates the Act can depend entirely on the subjective intent of the actor. For example, the Guidance explains that if a structure is destroyed with the specific purpose of killing owl nestlings inside that would be a violation of the MBTA, but that if the purpose of the same action was to destroy the structure, albeit with full knowledge the owls were inside and would be killed, that would not violate the Act.

69.     Defendants' new approach to MBTA implementation has been severely criticized by high-ranking DOI and FWS officials from both prior Republican and Democratic Administrations. For example, in a January 10, 2018 letter to Secretary Zinke, seventeen officials from the Nixon, Ford, Carter, George H.W. Bush, Clinton, George W. Bush, and Obama Administrations wrote that "[w]e are, each and all, very concerned by the Interior Department's December 22, 2017 announcement of a new legal memorandum (M-37050) reinterpreting the Migratory Bird Treaty Act." The letter explained that the Memorandum "is contrary to the long-standing interpretation by every administration (Republican and Democrat) since at least the 1970s," and that the Opinion announces a "new, contrived legal standard that creates a huge loophole in the MBTA" and that "needlessly undermines a history of great progress, undermines the effectiveness of the migratory bird treaties, and diminishes U.S. leadership." The officials also opined that "[h]ow birds fare in the world indicates how all wildlife and habitat, and by extension human populations, will fare," and that the "MBTA can and has been successfully used to reduce gross negligence by companies that simply do not recognize the value of birds to society or the practical means to minimize harm." The seventeen former officials urged Secretary

Zinke to rescind the new interpretation and instead to enforce the MBTA "based on common sense notions of reasonable foreseeability and readily available alternatives" and to continue working in "good faith with industries that had significant impacts on birds, such as oil and gas, coal, electric utilities, commercial fishing, communications, transportation, national defense, and others . . . ."

70.     In an announcement scheduled to be published in the Federal Register today, the FWS states it is "no longer considering preparation of a programmatic [EIS] . . . to evaluate the potential environmental impacts of a proposed rule to authorize incidental take of migratory birds under the [MBTA]." The Service explains that "[d]ue to issuance of the [Solicitor's Memorandum], the actions [previously] contemplated"—which would have "address[ed] various approaches to regulating incidental take of migratory birds" and "provided protection for entities that had taken efforts to reduce incidental take by promoting implementation of appropriate conservation measures to avoid or reduce avian mortality"—are "superseded, and we are no longer pursuing action on the [programmatic EIS]" the public was previously told would be prepared.

71.     Defendants' violations of law in issuing and implementing the Memorandum pose actual, ongoing, and imminent harm to the interests of Plaintiffs and their members, and a favorable judicial decision will prevent or redress such injury.

## CLAIMS FOR RELIEF

### Count One

### The Memorandum Violates the MBTA and is Arbitrary and Capricious

72.     The allegations of the preceding paragraphs are incorporated herein by reference.

73.     The MBTA states that it is "unlawful at any time, by any means or in any manner, to pursue, hunt, take, capture, kill, attempt to take, capture, or kill…any migratory bird." 16 U.S.C. § 703.

74.     The Memorandum sets forth, and is being treated by DOI and FWS as, a new binding position that the MBTA only contemplates liability where there is a "direct and affirmative" act specifically directed at the killing or taking of migratory birds. Opinion M-37050 at 41.

75.      DOI has stated that the Memorandum is a permanent departure from its prior interpretation and policy implementing the MBTA.  Memorandum at 1 ("this memorandum permanently withdraws and replaces Opinion M-37041."). The Memorandum is binding on, and is being followed by, all divisions of the DOI, *see* Departmental Manual, 209 DM 3.2A (11), and establishes the legal rights and duties of the DOI and regulated parties.

76.     Judicial review is therefore appropriate under the Administrative Procedure Act, 5 U.S.C. § 704 ("final agency action for which there is no other adequate remedy in a court are subject to judicial review"). Under the APA, "the whole or a part of an agency rule" is included as one such "agency action."  5 U.S.C. § 551(13). "'Rule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to *implement, interpret, or prescribe law or policy*."  5 U.S.C. § 551(4) (emphasis added).

77.      The Memorandum and the April 11, 2016 FWS Guidance implementing it interpret the language of the MBTA in a manner that is contrary to  the Department's prior interpretations of the MBTA and reverses Defendants' prior policy and interpretation of the protections offered to migratory birds by the plain language of the MBTA.

78.     By issuing an interpretation and policy that is binding on, and being followed by, DOI and FWS, and that declares categorically that any and all incidental (non-purposeful) take is immune from MBTA enforcement and regulation regardless of its impact on migratory birds, Defendants have acted in a manner that is arbitrary, capricious, and contrary to law, and otherwise outside of their congressionally delegated authority. 5 U.S.C. § 706(2).

79.     The Memorandum and the implementing FWS Guidance not only flout the plain language and overriding purpose of the MBTA and the treaties it implements, but also needlessly and unlawfully put migratory bird populations in grave peril, and arbitrarily and capriciously disregard reasonable alternatives for implementing the MBTA in a manner that would protect migratory birds by focusing on major foreseeable causes of incidental take by industries whose activities are most hazardous to migratory birds. The Memorandum's draconian, all or nothing approach to implementation and enforcement of the MBTA—under which the Act's take prohibition must *either* be applied in an all-encompassing manner regardless of any considerations of proximate causation or foreseeability, *or* the Act may *never* be applied to incidental take, even for, e.g., industrial activities as to which the killing and taking of a large number of migratory birds is entirely foreseeable —arbitrarily and irrationally ignores reasonable middle-ground approaches for implementing and enforcing the Act. This refusal to consider sensible alternatives is arbitrary and capricious and an abuse of discretion and hence violates the APA. It also arbitrarily and capriciously undermines decades of successful work by the FWS to develop collaborative programs with industry and Plaintiff conservation organizations aimed at protecting migratory while allowing industrial activities to proceed.

**Count Two**

**Defendants' Adoption and Implementation of the Memorandum Violates the Procedural Requirements of the APA**

80.     The allegations of the preceding paragraphs are incorporated herein by reference.

81.     The APA requires that agencies follow the notice and comment rulemaking procedures specified at 5 U.S.C. § 553. Those procedures mandate that agencies provide the public with general notice of proposed rulemaking" and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." *Id*. §§ 553(b), (c). The narrow exceptions to this requirement are for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

82.     The Memorandum was issued in violation of 5 U.S.C. § 553 because the Memorandum is subject to the APA's public notice and comment requirements, and none of the exceptions apply to the Memorandum. The Memorandum substantively modifies Defendants' prior MBTA policy as embodied in numerous past actions taken and positions announced by Defendants, by requiring a specific intent to "take" and "kill" protected species, and binds DOI and FWS to that position. The Memorandum effects a substantial and dramatic shift to the longstanding regulatory and policy regime because it reverses Defendants' prior approach to assessing liability for incidental take under the MBTA. Given that Defendants for many decades enforced and otherwise implemented the take provision of the MBTA where harm to migratory birds was a foreseeable consequence of certain activities, the permanent withdrawal of that longstanding position is a substantive change to existing law and policy with significant legal and practical consequences for affected parties with interests in migratory bird conservation as well as industries whose activities routinely kill or take migratory birds. In addition, as illustrated

31

by the April 11, 2018 FWS Guidance, the Memorandum is being followed and implemented by

DOI and FWS personnel as a mandatory and binding directive.

83.     Accordingly, the Memorandum constitutes a substantive or legislative rule

promulgated in violation of the notice and comment procedures mandated by the APA, 5 U.S.C.

§ 706(2)(D).

**Count Three**

**Defendants Failed to Comply with NEPA in Adopting and Implementing the
Memorandum**

84.     NEPA requires that, for all "major federal actions significantly affecting the

quality of the human environment," the federal agency taking the action must prepare an EIS

that, among other matters, analyzes the "impact of the proposed action," and "alternatives to the

proposed action."  42 U.S.C. § 4332(C). Regulations implementing NEPA define federal

"actions" subject to the EIS requirement as encompassing, *e.g.,* "new or revised agency . . .

policies," "[a]doption of official policy, such as rules, regulations, and interpretations," "official

documents prepared or approved by federal agencies which guide or prescribe alternative uses of

Federal resources," and "[a]doption of programs, such as a group of concerted actions implement

a specific policy or plan." 40 C.F.R. § 1508.18. To determine whether a particular action has

sufficiently significant environmental impacts to warrant preparation of an EIS, an agency may

prepare an Environmental Assessment ("EA"). *Id*. § 1508.9.

85.     Federal actions properly subject to a "categorical exclusion" ("CE") from NEPA

review need not be analyzed in an EIS or EA. *Id*. § 1508.4. A CE is a "category of actions which

do not individually or cumulatively have a significant effect on the human environment and

which have been found to have no such effect in procedures adopted by a Federal agency in

implementation" of NEPA. *Id*. Any such procedures "shall provide for extraordinary

circumstances in which a normally excluded action may have a significant environmental effect." *Id*. In turn, DOI's procedures implementing NEPA delineate various agency "actions," including "legal opinions," that are "categorically excluded [from NEPA review], *unless any of the extraordinary circumstances in section 46.215 [of DOI's regulations] apply*." 43 C.F.R. § 46.210(d) (emphasis added).

86.     Such "[e]xtraordinary circumstances" precluding invocation of a CE exist when any action will: "[h]ave significant impacts on . . . migratory birds"; "[h]ave highly controversial environmental effects"; "[h]ave highly uncertain and potentially significant environmental effects or involve unique or unknown environmental effects"; and/or "[e]stablish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental risks." *Id*. §§ 46.215(b), (c), (d), (e). "Any action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances in section 46.215" and "if it does, further analysis and environmental documents must be prepared for the action." *Id*. § 46.205(c)(1).

87.     The Memorandum and the April 11, 2018 FWS Guidance implementing the Memorandum constitute agency action as defined by the NEPA implementing regulations and they will, and are designed to, significantly affect the environment by eliminating any need or obligation to comply with the MBTA by industries whose activities foreseeably, albeit incidentally, kill and take migratory birds. The Memorandum is already having an adverse impact on the environment because it is being followed by DOI and FWS personnel. Nonetheless, Defendants did not prepare an EIS before issuing the Opinion. Nor, on information and belief, did Defendants prepare an EA, properly invoke a CE, evaluate whether a CE may properly be invoked under the circumstances, or make any other effort to comply with NEPA

before dramatically changing their approach to MBTA implementation. This omission violates NEPA and NEPA implementing regulations and is therefore arbitrary and capricious, an abuse of discretion, and not in accordance with law, and a failure to follow procedure required by law, in violation of the APA, 5 U.S.C. § 706(2).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

88.     Declare that Defendants' Memorandum and the FWS's April 11, 2018 Guidance implementing the Memorandum violate the APA and NEPA;

89.     Vacate the Memorandum and the April 11, 2018 Guidance;

90.     Reinstate Defendants' prior interpretation and policy regarding MBTA coverage and implementation;

91.     Award Plaintiffs their costs of litigation; and

92.     Grant Plaintiffs such other relief as the Court deems just and proper.

Dated: May 24, 2018

Respectfully submitted,

/s/Ethan I. Strell
Ethan I. Strell
National Audubon Society
225 Varick St.
New York, NY  10014
(212) 979-3000
estrell@audubon.org

/s/Eric R. Glitzenstein
Eric R. Glitzenstein
(Pro Hac Vice Application Pending)
D.C. Bar No. 358287
Meyer Glitzenstein & Eubanks LLP
Suite 210
4115 Wisconsin Ave., N.W.
Washington, D.C.  20016
(202) 588-5206

eglitzenstein@meyerglitz.com

/s/Jason C. Rylander
Jason C. Rylander
(Pro Hac Vice Application Pending)
DC Bar No. 474995
Defenders of Wildlife
1130 17th Street, NW
Washington, DC 20036
(202) 772-3245
jrylander@defenders.org

William F. Sheehan
General Counsel
American Bird Conservancy
4301 Connecticut Ave., N.W.
Washington, D.C. 20008
(202) 234-7181
Wsheehan123@gmail.com

Counsel for Plaintiffs